UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                                        :
**UNITED STATES,**                                                      :
                                                                        :
                              **Plaintiff,**                    :
                                                                        :       **07 Cr. 727 (HB)**
           **- against -**                                          :
                                                                        :       <u>**OPINION & ORDER**</u>
**GERALD DAVIS,**                                                       :
                                                                        :
                              **Defendant.**                   :
                                                                        :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

       On November 16, 2007, Defendant Gerald Davis pleaded guilty to one count of illegal possession of a sawed-off double barrel shotgun in violation of 26 U.S.C. § 5861(d). The Probation Office for this district calculated a sentence range based on the United States Sentencing Guidelines of eighteen to twenty-four months' imprisonment, which properly reflects a total offense level of fifteen and a Criminal History Category of I. I have reviewed the presentence report, defense counsel's brief and the relevant law, and, while I agree with the Guidelines analysis, this is clearly a case outside the Guidelines, and my sentence will consist of time served, three years' supervised release, with various conditions as set forth below, 200 hours of community service and a $100 special assessment fee. I have concluded, along with the Probation Office, that no fine would be appropriate.

## I. FACTUAL BACKGROUND

     Mr. Davis is a 36-year-old black male, married with six children, and has no prior criminal convictions.[1] Southern District of New York Probation Office, Presentence Investigation Report 2, ¶ 6 (prepared Jan. 31, 2008, revised Feb. 20, 2008) 2, ¶¶ 40-42, 47 ("PSR"). Mr. Davis was raised by his mother and grandmother in a "close-knit" family. *Id.* ¶ 46. His father left when he was five years old and never provided any financial support. *Id.* As a result, Mr. Davis's mother worked as a home health aide to support Mr. Davis and his sister, Ashanti Davis, and the family moved in with Mr. Davis's maternal grandmother. *Id.* His

---

[1] Mr. Davis does have prior arrests. The Presentence Investigation report indicates that on February 14, 1996, Mr. Davis was arrested in Roanoke, Virginia and charged with felony drug possession. He was subsequently arrested on April 3, 1996, and charged with failure to appear. These charges were dismissed on May 13, 1996.

mother now works as a counselor for United Cerebral Palsy, despite having suffered a stroke approximately four years ago. *Id.* ¶ 44. His sister is an EMS driver for the New York City Fire Department. *Id.* ¶ 45. Mr. Davis remains close with his mother and sister who both also live in the Bronx, New York. *Id.* ¶ 46.

At sixteen years of age, Mr. Davis left home to attend Job Corps training. *Id.* Administered by the United States Department of Labor, Job Corps enables young people to learn a trade and find a related job while earning their high school diploma or GED. *See* http://jobcorps.dol.gov/about.htm. Through Job Corps, Mr. Davis earned his GED and a diploma in welding. PSR ¶ 59. The following year, he also earned a gas-welding diploma. *Id.* ¶ 60. Thereafter, while Mr. Davis was unable to find a welding position, he maintained regular employment in various capacities throughout his adult life. Before his offense in 2006, he was employed as a maintenance worker at a nursing home for six years until he was laid off. *Id.* ¶ 63. He struggled thereafter with unemployment as a result of tearing the anterior cruciate ligament in his left knee in 2006. Def.'s Br. 3. He underwent reconstructive surgery in 2007 and subsequently required physical therapy three times per week. *Id.* Even while ill, he continued to supplement the family's public assistance funds by working as a barber from home, earning approximately $200 per month. PSR ¶ 62.

In addition, Mr. Davis has not abandoned hopes of a better life for him and his family and believes in the importance of education in order to reach that end. Def.'s Br. Ex. F. In November 2007, Mr. Davis enrolled in the State University of New York's Education Opportunity Center, a college preparation program, and has been faithfully attending twenty hours of college courses per week. The Probation Office indicates that he provided documentation from the State University of New York to substantiate this information. PSR ¶ 61. He was scheduled to complete the program in May of 2008, and while his knee surgery has delayed his progress somewhat, his counsel indicated that he is participating in a tutorial to get back on track and should complete both the tutorial and the program itself in the near future. Mr. Davis aspires to begin Hostos Community College's radiology program in September 2008, though it is not clear whether this will be possible given his delayed completion of the college prep program. *Id.*

Mr. Davis has continued to pursue other employment to help his family, and on March 18, 2008 began to work at a restaurant in Queens, New York during the day. Def.'s Br. 3. He

has arranged his life so that following his day job he can attend school and study from 5 to 10 p.m.  Def.'s Br. Ex. F.

In 1993 Mr. Davis married his "childhood sweetheart," Renee Williams, with whom he has six healthy small children, ranging in age from three years to twelve years.  Def.'s Br. 2; PSR ¶ 47.  He described their nearly fifteen-year marriage as very close and focused on their children.  PSR ¶ 48.  The family lives, and has for some time lived, in a well-kept four-bedroom apartment in the Bronx, New York.  *Id.* ¶ 51.  Mr. Davis and his wife hope to move their family to another state, where they might more easily fulfill their dream of owning their own home.  *Id.* ¶ 48.  Before achieving a relatively stable home life, the family had resided in a homeless shelter for three years.  *Id.* ¶ 52.  Throughout that period, Mr. Davis explains that he and his wife "worked night and day" to provide for their family and to find a path out of the shelter.  Def.'s Br. 3.

Mr. Davis is in many ways the primary caretaker of his six children and is deeply involved with their daily lives.  PSR ¶ 48.  He prepares all of the family meals.  *Id.*  His children have written letters to the Court about playing sports and going to movies and parks with their father.  Def.'s Br. Ex. D.  He is also actively involved in their education and extracurricular activities.  PSR ¶ 48.  He assists his children with their homework each day.  *Id.* ¶ 50.  A schoolteacher for two of Mr. Davis's children stated that Mr. Davis maintains an active presence in school activities: he volunteers to chaperone school trips and attends Parent Teacher Association meetings and every parent-teacher conference.  Def.'s Br. Ex. C.  He assisted his eldest daughter, Jovena, at age twelve, to successfully become president of her sixth grade class.  Def.'s Br. Ex. D.  Letters to the Court from his children express a deep bond and love for their father and his dedication to them.  *Id.*  Further, the doctor's office for Mr. Davis's children awarded Mr. Davis "Father of the Month" for being so attentive to his children's health.  Def.'s Br. 2.  The children's doctor, Dr. Phang, who has known the family for eight years, describes Mr. Davis as "courteous and respectful" with respect to his family and to the medical staff.  Def.'s Br. Ex. B.  Dr. Phang noted the rarity of finding a devoted father who is truly "invested in the health" of all of his children.  *Id.*

Mr. Davis's wife, Ms. Williams, is a physical therapy student who is scheduled to complete her degree at the end of the fall semester of 2008.  PSR ¶ 47.  Mr. Davis's wife describes Mr. Davis as a great husband and father, and says that they have a "genuine loving" marriage.  PSR ¶ 50.  She stated that she and Mr. Davis have been involved in a relationship since they were teenagers and have never been apart.  Def.'s Br. Ex. E.  Mr. Davis's wife was

"shocked" to learn of his arrest and described his involvement in the crime as a "foolish" mistake. PSR ¶ 49. She stated that their children would be "traumatized" if their father were sent to jail and that she cannot imagine they could survive without him. Def.'s Br. Ex. E. Since her family lives in Florida and Mr. Davis's mother and sister both work, Ms. Williams would largely be on her own to raise their six children during Mr. Davis's incarceration. PSR ¶ 48. Mr. Davis's two older daughters are aware of his offense and along with his wife, they are worried about the possibility of his incarceration. *Id.* He, too, is worried that jail time would "destroy" his close family. *Id.* A photo of Mr. Davis with his children reveals smiling children in their father's arms. Def.'s Br. Ex. A. Mr. Davis appears genuinely remorseful about his actions and he seems to appreciate the negative impact that future criminal behavior would have on his children's lives and his stable marriage. Def.'s Br. Ex. F.

While the motivation for Mr. Davis's offense is unclear, financial hardship due to his unemployment may have been a factor. PSR at 18. Mr. Davis has no assets and is $84 in credit card debt. PSR ¶ 69. Mr. Davis and his family depend mainly on public assistance for their rent and their modest living expenses. *Id.* While Mr. Davis did not discuss his drug history, drug testing was a condition of his bail. *Id.* ¶ 56. He once tested positively for the presence of marijuana. *Id.* However, in early 2008, Mr. Davis tested negative for all illegal narcotics and has been clean at each test over the last three months, with the last test in late May. *Id.* ¶ 57.

## II. OFFENSE

The Bureau of Alcohol, Firearms, Tobacco and Explosive ("ATF") commenced its investigation into the instant offense and in early 2006 received information from a confidential informant that Hisham Saleh had informed the confidential informant that he could obtain firearms and narcotics. *Id.* ¶¶ 10-11. Eventually, the confidential informant arranged to purchase several firearms, on several different occasions, from Saleh. *Id.* ¶ 12. On October 4, 2006, Saleh told the confidential informant that he could obtain a sawed-off shotgun for the confidential informant to purchase for $250. *Id.* ¶ 16. Saleh told the confidential informant that he knew someone named "G," who was subsequently revealed to be Defendant Gerald Davis, who had a sawed-off shotgun, double barrel. *Id.* ¶ 17. According to the Federal Firearms Licensing Center neither Saleh nor Mr. Davis was a licensed firearms dealer, nor was either one registered to possess a sawed-off shotgun. *Id.* ¶ 25.

Mr. Davis was arrested pursuant to a warrant on August 7, 2007, almost a year after the offense in October 2006, hardly a testament to his being harmful to the community. *Id.* ¶ 26.

On November 16, 2007, Mr. Davis pleaded guilty to one count of illegal possession of a sawed-off double barrel shotgun in violation of 26 U.S.C. § 5861(d). *Id.* ¶¶ 5, 71. The Probation Office for this district calculated a sentence, with which I concur, with a range based on the Guidelines of eighteen to twenty-four months' imprisonment. This represents a total offense level of fifteen and a Criminal History Category of I.[2] *Id.* ¶¶ 39, 42. The Probation Office's Presentence Investigation report states that Mr. Davis has been released on bond and is in compliance with the conditions of his bond. *Id.* ¶ 7.

### III.  DISCUSSION

A trilogy of Supreme Court cases over the past several years has made it "pellucidly" clear that while judges must pay homage to the Guidelines, the Guidelines are only advisory. *Gall v. United States*, 128 S. Ct. 586, 594 (2007). *See also Kimbrough v. United States*, 128 S. Ct. 558 (2007); *United States v. Booker*, 543 U.S. 220 (2005). In *Gall*, the Supreme Court provided considerable guidance to the post-*Booker* sentencing court. In the district court, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" in deciding what sentence to impose. 128 S. Ct. at 596. However, a district judge "may *not* presume that the Guidelines range is reasonable," but must "make an individualized assessment on the facts presented." *Id.* at 596-97 (emphasis added).

Quoting from the Supreme Court's earlier opinion in *Koon v. United States*, 518 U.S. 81, 113 (1996), Justice Stevens in *Gall* wrote that "in the federal judicial tradition[,] . . . the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 128 S. Ct. at 598. As articulated by the district court in *United States v. Coughlin*, No. 06 Cr. 20005, 2008 WL 313099, *7 (W.D. Ark. Feb. 1, 2008), on remand after the Supreme Court's decision in *Gall*:

> [B]ased on the unique facts of a particular case, austere adherence to the averages and generalities of the Guidelines can be unjust and contrary to reason. . . . No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula.

---

[2] The total offense level of fifteen reflects a three-point reduction for acceptance of responsibility. PSR ¶ 36.

5

A.      **18 U.S.C. § 3553(a) Factors**

In making such an individual assessment, the district court must contemplate, in addition to the Guidelines, the factors laid out in 18 U.S.C. § 3553(a). *Gall*, 128 S. Ct. at 596. The "overarching" command of § 3553(a) is the Parsimony Clause, which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 128 S. Ct. at 563 (quoting *Gall*, 128 S. Ct. at 600). The goals of sentencing as set forth in § 3553(a)(2) are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In applying these sentencing goals to the offense at hand, the Court must consider (1) the nature and circumstances of the offense and the offender's history and characteristics, (2) the sentences available, (3) the sentencing range established in the Sentencing Guidelines, (4) policy statements issued by the Sentencing Commission, (5) the need to avoid unwarranted sentence disparities among similarly situated defendants, and (6) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1), (a)(3)-(7). Here, the restitution element is irrelevant.

After considering both the Guidelines and Mr. Davis's individual circumstances, I conclude that any term of imprisonment not only would be "greater than necessary" to accomplish the goals of sentencing, but also would undermine those goals by halting Mr. Davis's significant positive impact on his children's life. While Mr. Davis's offense, possession of a sawed-off shotgun, was a serious one, he has no other conviction and the Presentence Investigation report demonstrates that his role was minor in comparison with Saleh's role, which included a number of firearms sales. While some punishment is appropriate to promote respect for the law, Mr. Davis does not appear to be a danger to the public, and therefore imprisonment is unnecessary to fulfill the purposes enumerated in § 3553(a)(2)(C), *i.e.*, to protect the public from further crimes of the defendant.

Moreover, incarceration is not necessary here in order to assure adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). Letters from Mr. Davis, his family, his

6

children's pediatrician and his children's schoolteacher have convinced me that being arrested, pleading guilty and living some months with the expectation of incarceration and the concomitant separation from his family have already deterred Mr. Davis from any future criminal conduct. I am further convinced that a period of supervised release and community service will provide adequate additional deterrence and that a term of imprisonment is not necessary.

Neither would incarceration reflect the seriousness of the offense, promote respect for the law or provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). There is no evidence that Mr. Davis's possession of the shotgun and minimal participation in its sale was part of a pattern of conduct.

Indeed, incarceration would likely undermine the fourth goal of sentencing, to provide Mr. Davis with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D). As set forth above, Mr. Davis has demonstrated that he is a significant positive force in his children's lives and has a solid relationship with his wife. Any term of imprisonment would be disastrous to Mr. Davis's family. Indeed, even the Probation Office has indicated that it "believe[s] that the circumstances in this case are extraordinary," and that "[i]f the defendant is incarcerated, he will be unable to provide his children with the care and guidance that is clearly needed at this point in their lives. The negative current and future impact that even a short custodial term will have on the family unit seems too great to impose a custodial sentence in this case." PSR at 19. *See United States v. Kon*, No. 04 Cr. 271-03, 2006 WL 3208555, *5-6 (S.D.N.Y. Nov. 2, 2006) (imposing non-Guidelines, non-incarceration sentence where defendant had no prior criminal history and after considering factors in 18 U.S.C. § 3553(a) and finding that incarceration would damage the defendant's children, who relied on her); *United States v. Hawkins*, 380 F. Supp. 2d 143, 165 (E.D.N.Y. 2005), *aff'd*, 228 Fed. App'x 107 (2d Cir. 2007) (concluding that any incarceration "will in effect doom her. . . . Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

**B.     Sentence of Time Served and Supervised Release**

Appropriate guidance in Mr. Davis's case will be provided during his term of supervised release, in lieu of imprisonment and without interruption in Mr. Davis's already positive trajectory. Supervised release is tantamount to probation, and the courts and the United States Sentencing Commission have recognized that probation is both rehabilitative and punitive:

7

> Probation is viewed by many as rehabilitative in nature . . . However, probation is also a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.'

*U.S. v. Brady*, No. 02 Cr. 1043, 2004 WL 86414, *8-9 (E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, introductory cmt.).

In *Gall*, the Supreme Court reviewed the Eighth Circuit's vacatur of the probationary sentence imposed by the district court. The Supreme Court thought it was error for the Eighth Circuit to give no weight to the significant burdens inflicted by a term of supervised release or probation. The Court observed that probation, or supervised release without additional incarceration, is not an act of leniency, but rather a "substantial restriction of freedom" because probationers "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court." 128 S. Ct. at 595-96. Probationers must "report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Id.* at 596.

Here, a sentence of time served and supervised release of three years and the requirement to perform 200 hours of community service is therefore sufficient, but not greater than necessary, to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, protect the public and provide Mr. Davis with appropriate guidance, while permitting him to continue to nurture his positive family relationships and his effort to secure more education for himself and his children. *See U.S. v. Hawkins*, 228 Fed. App'x 107, 108-09 (2d Cir. 2007) (upholding the district court's non-Guidelines probationary sentence under § 3553(a) due to the defendant's positive progress during the year between her indictment and sentence).

## IV. SENTENCE

For the reasons set forth above, due to his extraordinary family circumstances and demonstrated motivation to stay out of trouble, Mr. Davis's case falls "outside the 'heartland' to which the [United States Sentencing] Commission intends individual Guidelines to apply," and thus I find that any term of imprisonment would be greater than necessary to fulfill the purposes of sentencing set out in 18 U.S.C. § 3553(a). *See Kimbrough*, 128 S. Ct. at 563. In sum the Defendant is sentenced to time served, three years of supervised release and 200 hours of

8

community service, as determined by the Probation Office with notification to this Court as to where and when the community service will take place.

Mr. Davis's total offense level of fifteen is also subject to a fine under § 5E1.2 of the Guidelines, in the amount of $4,000 to $40,000. The Guidelines require that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The court must consider any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) and the expected costs to the Government of any period of probation or supervised release. Here, as Mr. Davis, his wife and six children are living on public assistance, food stamps and Mr. Davis's earnings at present of only about $200 per month, PSR ¶ 69, it does not appear he has any ability to pay a fine in the immediate or near future. Therefore, the fine for Mr. Davis will be waived, as recommended by the Probation Office.

As conditions of Mr. Davis's supervised release, he must (1) not commit another federal, state or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) perform the 200 hours of community service as ordered and as will be specified by the Probation Office; (5) provide a letter to the Court on a quarterly basis, beginning July 1, 2008 (i.e., July 1, October 1, January 1 and April 1 of each year of supervised release), apprising me of the progress that he has made; (6) submit to one drug test within fifteen days of this opinion and two additional drug tests, without prior notification, during the course of his supervised release; and (7) pay the $100 special assessment fee, in addition to the standard conditions of supervised release (1-13).

**IT IS SO ORDERED.**
**New York, New York**
**June 5, 2008**

_____
U.S.D.J.